Clem's Cafe Liquor License Case.

Argued November 23, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Thomas J. Shannon,* Assistant Attorney General, with him *Edward J. Osterman,* Special Assistant At-

torney General, and *Edward Friedman*, Attorney General, for Pennsylvania Liquor Control Board, appellant.

*George B. Stegenga*, with him *Murphy & France*, for appellee.

OPINION BY MR. JUSTICE O'BRIEN, March 21, 1967:

We have before us for determination, this case, in which the relevant material facts are not in dispute. The appellees, Clement DaPra and Antoinette DaPra, his wife, are the holders of a restaurant liquor license. The tavern which they operate under the trade name of Clem's Cafe, is in the Borough of Canonsburg, Washington County. A police officer of the Borough, while patrolling, on or about February 8, 1965, noticed a young man come out of the tavern carrying a bag. The officer stopped to question him, and the young man dropped the bag and ran, but was apprehended immediately. Mr. DaPra admitted that he had made the sale of 4 quarts of Iron City beer after having inquired of the age of the young man, and after he had produced a draft card issued in West Virginia. The draft card indicated that the person to whom it was issued was born February 1, 1938. Interrogation revealed that the young man's name was Charles Smith, of McDonald, Pennsylvania, and he was using a draft card issued to another person from whom he bought it. Charles Smith was turned over to the juvenile authorities, and the attendant newspaper publicity drew attention to the incident, and the Liquor Control Board issued a citation to the licensees, the appellees herein. The Board suspended the license of the appellees for 10 days, finding that: "The licensees, their servants, agents or employes sold, furnished and/or gave or permitted such sale, furnishing and/or giving of alcoholic

beverages to minors, on February 8, 1964." This order was appealed to the Court of Quarter Sessions of Washington County, which court sustained the appeal and reversed the board's order suspending the license.

The Liquor Control Board appealed to the Superior Court, which affirmed the order of the Court of Quarter Sessions of Washington County, in a per curiam opinion, Judge MONTGOMERY dissenting. We granted allocatur.

The lower court found that "Charles Smith, a minor, went into Clem's Cafe and bought four quarts of beer. The proprietor, who was tending bar at the time, had a question as to the customer's age because he 'looked border-line'. So challenged, Smith produced a draft card showing that he was Lewis William Nestor, of Rowlesburg, West Virginia." The court also found that the description on the draft card "fits him almost perfectly", Smith. The court further noted that "Our County has a border on the State of West Virginia, and it is not at all uncommon for West Virginia license plates to be seen on the streets of Washington County towns, or for West Virginians to do business, look for work, or seek refreshment in Washington, Claysville, Canonsburg or Fredericktown. The Hearing Judge finds it a fact that Smith's artful deception did deceive Clement DaPra, licensee, on the stated date. Since Smith had a West Virginia draft card, it would have been idle to have asked him for Pennsylvania type identification, either that furnished by the Liquor Control Board or voter's registration." The court found that Mr. DaPra was a man of good reputation and that there had been no previous record of any infraction of the Liquor Control Laws. The court further held that "Under the circumstances, therefore, it seems proper to sustain the appeal. To do otherwise would be to exalt form over substance. The furnishing and perusal of the West Virginia draft

card would seem to be substantial, although not meticulous, compliance with the relevant legislation."

The citation proceedings instituted against the appellees were pursuant to the Act of April 12, 1951, P. L. 90, as amended, 47 P.S. §1-101 et seq., known as the "Liquor Code", §471, 47 P.S. §4-471. The appellant charges the appellees with infraction of §493(1), 47 P.S. §4-493(1), of the Liquor Code, which provides: "It shall be unlawful—(1) . . . for any licensee . . . or any employe, servant or agent of such licensee . . . to sell, furnish or give any liquor or malt or brewed beverages to be sold, furnished or given, . . . to any minor . . ." [1] Section 495, 47 P.S. §4-495 of the Liquor Code provides, in pertinent part, as follows: "Section 495. Identification Cards; Licensees and State Liquor Store Employes Saved From Prosecution. (a) The board shall issue, upon application of any citizen who shall have attained the age of twenty-one years, an identification card bearing the applicant's date of birth, physical description, photograph, signature, . . . (b) Such identification card shall be presented by the holder thereof upon request of any State Liquor Store or any licensee, or the servant, agent or employee thereof, for the purpose of aiding such store licensee or the servant, agent or employe to determine whether or not such person is twenty-one years of age and upwards, when such person desires alcoholic beverage at a State Liquor Store or licensed establishment. (c) In addition to the presentation of such identification card, the agent or employe, shall require the person whose age may be in question to fill in and sign a card in the following form: . . . (e) The signed statement in the possession of a licensee or an employe of a State Liquor Store may be offered as a defense in all civil and criminal prosecutions for serving a minor, and no

---

[1] Charles Smith was born May 26, 1947.

penalty shall be imposed if the Liquor Control Board or the courts are satisfied that the licensee or State Liquor Store employe acted in good faith."

In *Com. v. Borek,* 161 Pa. Superior Ct. 200, 54 A. 2d 101 (1947), the Superior Court said: "The sole question raised by this appeal from a conviction of violating the Liquor Control Act of November 29, 1933, P. L. 15, 47 PS 744, as amended, is whether or not the Act of May 25, 1897, P. L. 93, 47 PS 603, is still in force. The latter act permitted a licensed vendor upon the charge of furnishing liquor to a minor to offer evidence to show that it was not furnished knowingly or negligently." The Superior Court went on to say that: "The sale of intoxicating liquor was at that time regulated and controlled by the Brooks Law of May 13, 1887, P. L. 108. The Brooks Law prohibited the sale to minors, and in a proceeding to revoke a license on the ground that the licensee sold liquors to minors, the Supreme Court held that the good faith of the licensee was no excuse or justification for such sale: In re Carlson's License, 127 Pa. 330, 18 A. 8." The court held that under the Liquor Control Act of 1923, P. L. 34, the mere fact of selling intoxicating liquor or beverage to a minor constituted an offense, irrespective of intention or good faith. The Superior Court said in *Borek,* supra: "In Commonwealth v. Liberty Products Company, 84 Pa. Superior Ct. 473, where the defendant was charged with a violation of the Act of 1923, supra, this court held (pp. 475-476) : 'Ordinarily intent is a necessary ingredient of a criminal offense, but there are well recognized exceptions to this rule, as respects acts made criminal by statute. The subject is treated in Greenleaf on Evidence (Vol. 3, Sec. 21) as follows: "Ignorance or mistake of fact may in some cases be admitted as an excuse; as where a man intending to do a lawful act, does that which is unlawful. . . . This

rule would seem to hold good in all cases when the act, if done knowingly, would be malum in se. But where a statute commands that an act be done or omitted, which, in the absence of such statute, might have been done or omitted without culpability, ignorance of the fact or state of things contemplated by the statute, it seems, will not excuse its violation. . . .'' '

"The rule followed in that case was never more succinctly or concisely stated than in the language of Chief Justice COOLEY, in People v. Roby, 18 N.W. 365 (Mich.) as follows: 'Many statutes which are in the nature of police regulations, as this is, impose criminal penalties, irrespective of any intent to violate them, the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible.' " See also: *Com. v. Koczwara,* 397 Pa. 575, 155 A. 2d 825 (1959), which affirmed as modified the same case at 188 Pa. Superior Ct. 153 (1958) ; *Com. v. Weiss,* 139 Pa. 247, 21 A. 10 (1891) ; *Com. v. Zelt,* 138 Pa. 615, 21 A. 7 (1891) ; *Com. v. Holstine,* 132 Pa. 357, 19 A. 273 (1890) ; *Com. v. Miller,* 131 A. 118, 18 A. 938 (1890) ; *Com. v. Sellers,* 130 Pa. 32, 18 A. 542 (1889) ; *Com. v. Jackson,* 146 Pa. Superior Ct. 328, 22 A. 2d 299 (1941).

The Legislature, by the exercise of its police power, may deem certain acts, although not ordinarily criminal in themselves, harmful to the public safety, health, morals and general welfare, and absolutely prohibit them, either expressly or impliedly, by omitting all references to such terms as: "knowingly", "willfully", "intentionally", and the like. Such statutes are in the nature of police regulations, and it is well established that the legislature may, for the protection of all the people, punish their violation without regard to the question of guilty knowledge.[2] These regulatory enact-

---

[2] Burdick Law of Crime, §129(q).

100

ments, largely in the nature of police regulations, are generally referred to as malum prohibitum, and not requiring guilty knowledge as in the malum in se crimes. Although it is difficult, if not impossible, to divide the malum in se, or acts wrong in themselves, from the malum prohibitum, or those which are merely prohibited, the courts must interpret the legislative intent.[3]

The Legislature, in 1951, enacted the "Liquor Code" (April 12, P. L. 90, 47 P.S. §1-101 et seq.), which provided, by §495, a protection for a licensee who questioned the age of one by requiring him to produce a permanent voter's registration identification card, and requiring the person to fill out a form. This Section (495), was amended in 1961, August 21, P. L. 1015, 47 P.S. §4-495 (Pocket Part). The only defense available for a licensee or State Liquor Store employe is that provided for in §495 of the Liquor Code, the relevant parts of which we have quoted, supra.

The Legislature provided a licensee with the means to protect himself where he has reason to doubt or suspect the age of a customer. The defendant did not avail himself of this defense provided for in §495, and, as he was deceived by the customer's age and the draft card used by the minor, the licensee, nevertheless, violated the Liquor Code.

---

[3] Book I, Blackstone's Commentaries, p. 58:

"But in relation to those laws which enjoin only *positive duties*, and forbid only such things as are not *mala in se*, but *mala prohibita* [crimes, because forbidden] merely, without any intermixture of moral guilt, annexing a penalty to non-compliance, here I apprehend conscience is no farther concerned, than by directing a submission to the penalty, in case of our breach of those laws, for otherwise the multitude of penal laws in a state would not only be looked upon as an impolitic, but would also be a very wicked thing; if every such law were a snare for the conscience of the subject. . . ."

The order of the court of quarter sessions, affirmed per curiam by the Superior Court, is reversed, and the order of the Liquor Control Board is reinstated.

Mr. Justice ROBERTS concurs in the result.

Mr. Chief Justice BELL dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

There should be no rule which declares, with the finality of doom on the Day of Judgment, that no explanation will be permitted to show that something is not what it seems. The defendant in this case, Clement DaPra, has been convicted of performing an obviously innocent act. He was fooled, deceived, and imposed upon, and, because he was subjected to indignity and harm through no fault of his own, the law, speaking through this Court, comes along to push him off the ledge of the window to which he fell from a higher floor without negligence on his part.

It is not correct to say, as the Majority Opinion does, that there are certain laws which have no exception. There is not a rule in the law books of the country which may not be set aside when it can be shown that the serpent of fraud has spoken with forked tongue. When deceit and wickedness tie a guiltless person to the stake, the law will cut the bonds and release him. But not, according to the Majority, in this case. Why not?

Clement DaPra and his wife, Antoinette DaPra, own a modest tavern in Canonsburg, Washington County. One day, a young man came in and asked for beer. Clement DaPra, fearing this customer might not be an adult, asked him his age. The youth replied that he was over 21 and, in documentation of this assertion, presented a West Virginia draft card which showed he was 26. Washington County borders on the State of West Virginia and many West Virginians

come into Washington County on business and for social reasons. DaPra was convinced that there was nothing unusual about the youth's visit and accordingly sold him, in accordance with the youth's request, four bottles of beer, which he took away with him.

The Liquor Control Board served a citation on DaPra and, after a hearing before an examiner of the Board, suspended his restaurant liquor license. DaPra appealed to the Court of Quarter Sessions of Washington County which went into an extensive hearing and found that DaPra had not violated the law. In its decision the court said: "Since Smith had a West Virginia draft card, it would have been idle to have asked him for Pennsylvania type identification, either that furnished by the Liquor Control Board or voter's registration." The court said further that the description on the card fitted Charles Smith "almost perfectly and Smith certainly looks like an Anglo-Saxon hillbilly from the Appalachian region."

The Liquor Control Board appealed the decision of the Washington court to the Superior Court of Pennsylvania, which, after argument and study, affirmed the decision of the Washington court. The Liquor Control Board then appealed to this Court, and this Court reversed the previous two courts. On what basis?

The court of Washington County was the fact-finder. What do we know about the facts? Who are we, sitting here higher than the Appalachians, to train our jurisprudential telescope on a humble fellow-man and declare that there is no Balm in Gilead for him because he sold four bottles of beer? Certainly DaPra didn't become wealthy by that sale. He is a poor tradesman trying to eke out a living in what the laws of the Commonwealth declare to be an honorable business. DaPra is not a man of means, but he possesses one wealth which the decision of the Majority would take away from him, and that is his good name.

The lieutenant of police in Canonsburg, Patrick Matrogran, as well as a reputable businessman in the community, testified to DaPra's "good reputation, as a licensee, a citizen and a church member." He had never been in trouble before. No one pictured him other than an honest, straightforward person without guile or misdemeanor.

This Court now allows a shadow to darken his name, in spite of the fact that two other courts of record, closer to the facts, more familiar with the entire episode than we, have given him a clean slate. This Court, in its interpretation of decisions coming down from the Supreme Court of the United States, has released, or in some way mitigated the punishment due confessed burglars, robbers and established killers. It seems to me that it might be a little considerate of a man who honestly sells a few thimblefuls of beer to put some bread on his table for himself and family. The lower court said that DaPra was "not particularly successful." DaPra would not be the first honest man who failed to become rich.

In reversing the two other courts, this Court goes into a learned discussion between laws malum in se and laws malum prohibitum, taking me back nostalgically to my law school days, but I think that this erudite dissertation could be saved for something a little more substantial than what is involved here. Suppose someone, without the knowledge of the proprietor, turned back the clock in a tavern, and the proprietor sold beer after the official closing hour, according to Eastern Standard Time. Would this Court say that, regardless of clock, calendar, chronometer, or compass, regardless of deception, imposture, and trickery, regardless of common sense and arithmetic, the proprietor was guilty of violating the criminal code?

This is a little case. I should not be writing a Dissenting Opinion about it. Why should I care? The

Majority of the Court has spoken. It has spoken **bad** law, it has jettisoned logic, equity and sapience, but it has spoken, and it should not be my concern to complain about it. I have other cases of far more importance than this one awaiting my attention, study, and midnight lamp, but I am compelled to express my dissent against the decision of the Majority of this Court because I am disturbed about Clement DaPra, an honest citizen and a good church member, who is being stigmatized because someone blindfolded him and pushed him into a pit of undeserved prosecution.

When DaPra learned that Charles Smith was not 21 years of age, he hurried to the police station to notify the authorities of what had occurred. He was concerned with the dignity of the law and he was disturbed about young Smith who, he felt, was starting on the wrong path of life. DaPra gave of his time, attention and concern to the law. And for this he is now branded a law-breaker.

I cannot help stating with all candor that this case should never have come to the Supreme Court. We had no business to touch it. The court of common pleas, after listening to numerous witnesses, after considering all the evidence, and after taking judicial notice of the West Virginia-Pennsylvania boundary line and the traffic which passes back and forth over that line, found no violation in the law on the part of DaPra and released him. The Liquor Control Board appealed to the Superior Court, and the Superior Court, after studying the record, after hearing arguments, and after due deliberation, affirmed the decision of the Court of Quarter Sessions of Washington County and released DaPra as being without fault.

Then the Liquor Control Board, with a Javert persistence, all the while spending the money of the Pennsylvania taxpayers, petitioned this Court for an allocatur. This Court could well have turned down this

request for allocatur, as it turns down hundreds. But it allowed the petition. The Liquor Board then again spent large sums of the taxpayers' money to print the record and brief; its lawyers, again using taxpayers' money, gave of their expensive time to this monumental litigation, one or more of them traveled to the seat of judgment and delivered themselves of their extensive learning about a little case involving a little tradesman, who had been twice told by the Courts of the Commonwealth to go home and forget about the hard luck which had visited him when someone tripped him and sent him reeling into a brier patch of legal entanglement.

This Court then, the Supreme Court of Pennsylvania, the Court of last resort in the Keystone State of the Union, sat in exalted session, listened to the attorneys, went into deliberation, and finally, after months of study, analysis and profound cerebration, produced the decision which overruled the court of quarter sessions, overruled the Superior Court, and overruled the law of common sense, which is as much a part of the jurisprudence of American justice as formalistic codes.

But it is possible I am unfair in complaining. The Majority Opinion has been good to me by providing me with a magic carpet transporting me back in fancy to my halcyon days at Georgetown Law School where I learned with bated breath the distinction between laws malum in se and those malum prohibitum. The Majority Opinion has revived for me those ivy-clad days of my youth when I was joyously drinking in the lesson being taught me that law was the "distillment of reason."

Alas, I have since found out that that distillation is occasionally diluted by stale beer.