874 A.2d 623

**COMMONWEALTH of Pennsylvania, Appellant**

**v.**

**Gregory David LUDWIG, Appellee.**

Supreme Court of Pennsylvania.

Resubmitted Sept. 27, 2004.

Decided May 19, 2005.

8

10

Michael Wayne Streily, Pittsburgh, for the Com. of PA., appellant.

Mary Benefield Seiverling; Michael F.J. Piecuch, Boston, MA; Jonelle Harter Eshbach, for Office of Atty. Gen., appellant amicus curiae.

Patrick J. Thomassey, Monroeville, for Gregory David Ludwig, appellee.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Chief Justice CAPPY.[1]

This appeal presents a constitutional challenge to a criminal statute, 18 Pa.C.S. § 2506, "Drug delivery resulting in death," for vagueness, because the statute fails to sufficiently set forth the mental state required for criminal liability. Additionally, we are called upon to determine whether the trial court erred in granting Appellee Gregory Ludwig's Petition for Writ of Habeas Corpus based upon the Commonwealth's failure to establish a *prima facie* case under Section 2506. For the reasons that follow, we hold that Section 2506 is not unconstitutionally vague and that the applicable mental state for a conviction under the statute is malice. We further conclude, however, that the Commonwealth has failed to establish a *prima facie* case of malice under Section 2506. Accordingly, we affirm the order of the trial court, granting Ludwig's Petition for Writ of Habeas Corpus with respect to the charge of Drug delivery resulting in death.

The facts underlying this appeal are not in dispute. On the evening of May 17, 2001, fifteen-year-old Brandy French (Brandy), eighteen-year-old Paula Wilson (Paula), and seventeen-year-old Michelle Maranuk (Michelle) discussed with one another their desire to consume the drug Ecstasy at an all-day concert that they would be attending the following day. After the conversation, Michelle contacted a recent acquaintance, nineteen-year-old Ludwig, and informed him that she was interested in purchasing Ecstasy for herself and two of her friends. Ludwig replied that he would be willing to sell Michelle three Ecstasy pills at a price of $20 a pill and offered to meet her at the local Dairy Queen later that evening. Michelle relayed that information to Brandy and Paula, and the girls then arranged for Paula's boyfriend, Robert Sontag, to drive them to the Dairy Queen to meet Ludwig.

1. This appeal was reassigned to this author.

Upon arriving at the Dairy Queen, Ludwig entered the girls' car, and the entire group took a short drive. During the drive, Michelle took $20 from Paula and Brandy and handed Ludwig $60. In return, Ludwig supplied Michelle with three tablets of white double-stacked Mitsubishi Ecstasy.[2] Michelle kept all of the pills until the next day.

At approximately 4:00 p.m. the following afternoon, the three girls met in the ladies' room at the concert to take the Ecstasy. Michelle gave Paula and Brandy each a pill, but advised them to take only one-half of a pill, because it was double-dosed, and neither Paula nor Brandy had previously taken Ecstasy. The girls then ingested their pills, Michelle taking her whole pill and Paula and Brandy taking one-half of their respective pills. Paula and Brandy, however, believing that they had not experienced the full effects of the Ecstasy, returned to the ladies' room a short while later and consumed the remaining halves of their pills.[3]

Soon after consuming the second half of her pill, Brandy began to vomit. She also complained of a severe headache and became sluggish. After discussing the situation with some other friends they had met at the concert, Michelle, Paula, and their friends decided that they would take Brandy to the home of Lewis Hopkins (Lewis), a friend of Michelle's cousin, whom they had met at the concert.

Upon arriving at Lewis' home, the group carried Brandy, who was by that time semi-conscious, into the house and put her in a bed. The group then left Brandy in the bedroom and went to another part of the house. Lewis' mother, who was home at the time, inquired into Brandy's condition, but was told only that Brandy had been drinking at the concert and had become ill.

**2.** "White double stacked Mitsubishi" refers to the fact that the pills were white in color, contained a double dose of Ecstasy, and were "stamped" with the Mitsubishi automobile emblem.

**3.** There is conflicting testimony regarding who possessed the two halves of the pills after Michelle originally provided the pills to the girls. Michelle testified that Paula held on to the remaining halves, and Paula testified that Brandy held on to her half.

At approximately 9:30 p.m., Brandy began to have difficulty breathing. Although it was suggested that someone call an ambulance, an ambulance was not called because Brandy's breathing seemed to return to normal and Lewis' mother objected to an ambulance coming to her home for fear that it would tarnish her reputation. More than an hour later, however, Paula noticed that Brandy again was having difficulty breathing. Realizing that Brandy needed immediate medical attention, Michelle, Paula, and Lewis decided to take Brandy to a hospital. Brandy, however, stopped breathing when the group reached Lewis' driveway. At that point, Lewis' mother telephoned 911. After their arrival, police and paramedics took Brandy to a hospital. Subsequently, on May 20, 2001, Brandy died; an autopsy determined that Brandy's death was due to an overdose of Ecstasy.

As a result of these events, the Allegheny County Coroner's Office held an Open Inquest into Brandy's death. In August of 2001, the Coroner's office ultimately recommended that the District Attorney file charges of murder against Ludwig and Michelle. Subsequently, Ludwig was charged with one count of drug delivery resulting in death pursuant to Section 2506.[4]

On November 7, 2001, Ludwig filed a Petition for Writ of Habeas Corpus with the Court of Common Pleas of Allegheny County, arguing that Section 2506 is unconstitutionally vague in that the requisite mental element is too vaguely defined, and that even if the statute is not unconstitutionally vague, the Commonwealth had failed to present sufficient evidence to establish a *prima facie* case of the elements of Section 2506. The trial court granted Ludwig's petition on both grounds and dismissed the charge premised upon Section 2506. *See Commonwealth v. Ludwig*, 55 Pa. D. & C.4th 449 (Com.Pl. Allegheny Co.2002).

Specifically, in holding Section 2506 to be unconstitutionally vague, the trial court found that because the statute fails to sufficiently set forth the *mens rea* necessary for conviction, it

4. Ludwig was also charged with one count of delivery of a controlled substance, possession with intent to deliver, and possession. Michelle, however, was not charged with any criminal offense.

is impossible to determine whether Section 2506 functions as a strict liability offense or a new version of third degree murder requiring a showing of malice. *Id.* at 459. Given this lack of clarity, the trial court determined that Section 2506 does not sufficiently define the conduct to be prohibited by the statute, and consequently, is unconstitutionally vague. *Id.* In the alternative, the trial court reasoned that even if Section 2506 functions as a new version of third-degree murder adequately setting forth a *mens rea* of malice, it would still grant Ludwig's petition because the Commonwealth had failed to present sufficient evidence to establish a *prima facie* case that Ludwig acted with malice. *Id.* at 465–467.

The Commonwealth appealed the trial court's decision to our Court which has jurisdiction pursuant to 42 Pa.C.S. § 722(7), which provides that we shall have exclusive jurisdiction over an order of the court of common pleas holding a statute unconstitutional. We first consider the issue of whether Section 2506 is unconstitutionally vague.[5]

As a threshold matter, a statute is presumed to be constitutional and will only be invalidated as unconstitutional if it "clearly, palpably, and plainly violates constitutional rights." *Commonwealth v. MacPherson*, 561 Pa. 571, 752 A.2d 384, 388 (2000) (citation omitted). Related thereto, courts have the duty to avoid constitutional difficulties, if possible, by construing statutes in a constitutional manner. *Harrington v. Dept. of Transportation, Bureau of Driver Licensing*, 563 Pa. 565, 763 A.2d 386, 393 (2000); *see also* 1 Pa.C.S. § 1922(3) (setting forth the presumption that the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth). Consequently, the party challenging a

5. Analysis of the constitutionality of a statute, and whether the Commonwealth met its *prima facie* case under Section 2506, are both questions of law, therefore, our standard of review is de novo. *Commonwealth v. MacPherson*, 561 Pa. 571, 752 A.2d 384, 388 (2000); Pa.R.A.P 2111(a)(2). Our scope of review, to the extent necessary to resolve the legal questions before us, is plenary, i.e., we may consider the entire record before us. *Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002); Pa.R.A.P. 2111(a)(2).

statute's constitutionality bears a heavy burden of persuasion. *MacPherson*, 752 A.2d at 388.

Turning to the constitutional challenge raised in this appeal, as a general proposition, statutory limitations on our individual freedoms are reviewed by courts for substantive authority and content, in addition to definiteness or adequacy of expression. *See, Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). A statute may be deemed to be unconstitutionally vague if it fails in its definiteness or adequacy of statutory expression. This void-for-vagueness doctrine, as it is known, implicates due process notions that a statute must provide reasonable standards by which a person may gauge his future conduct, i.e., notice and warning. *Smith v. Goguen*, 415 U.S. 566, 572, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Commonwealth v. Heinbaugh*, 467 Pa. 1, 354 A.2d 244, 246 (1976).[6]

Specifically with respect to a penal statute, our Court and the United States Supreme Court have found that to withstand constitutional scrutiny based upon a challenge of vagueness a statute must satisfy two requirements. A criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855; *Commonwealth v. Mayfield*, 574 Pa. 460, 832 A.2d 418, 422 (2003); *Commonwealth v. Mikulan*, 504 Pa. 244, 470 A.2d 1339, 1342 (1983); *see also Heinbaugh*, 354 A.2d at 246; *see generally* Goldsmith, THE VOID-FOR-VAGUENESS DOCTRINE IN THE SUPREME COURT, REVISITED, 30 Am. J. Crim. L. 279 (2003).

In considering these requirements, both High Courts have looked to certain factors to discern whether a certain statute is

6. Ludwig claims that Section 2506 is violative of both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. He does not, however, suggest that a different analysis under our Constitution is applicable, and thus, we will analyze his vagueness challenge pursuant to the United States Constitution.

impermissibly vague. For the most part, the Courts have looked at the statutory language itself, and have interpreted that language, to resolve the question of vagueness. *See Kolender*, 461 U.S. at 358, 103 S.Ct. 1855; *Mayfield*, 832 A.2d at 422; *Commonwealth v. Cotto*, 562 Pa. 32, 753 A.2d 217, 220 (2000). In doing so, however, our Court has cautioned that a statute "is not to be tested against paradigms of legislative draftsmanship," *Heinbaugh*, 354 A.2d at 246, and thus, will not be declared unconstitutionally vague simply because the Legislature could have "chosen 'clear and more precise language' ...." *Id.* (citation omitted). The Courts have also looked to the legislative history and the purpose in enacting a statute in attempting to discern the constitutionality of the statute. *See United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 570–575, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Cotto*, 753 A.2d at 221. Consistent with our prior decisions, as well as United States Supreme Court case law, we will first consider the statutory language employed by the General Assembly in determining whether Section 2506 is unconstitutionally vague.

■ Section 2506 defines the crime of third-degree murder in the context where death results from certain conveyances of, *inter alia,* controlled substances in violation of the Controlled Substance, Drug, Device and Cosmetic Act:

(a) General rule-A person commits murder of the third degree who administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S § 2506(a) (footnote omitted).

While the statute proscribes that one who delivers drugs that result in death commits murder of the third degree, it contains no express element of culpability that is to be applied.

Ludwig argues that the trial court properly reasoned that the statute is unconstitutionally vague because it fails to define with requisite definiteness the mental state required for criminal liability. According to Ludwig, this lack of a clear standard leads to a risk of arbitrary governmental action. Conversely, the Commonwealth takes the position, employing a statutory construction approach, that by declaring a violation of Section 2506 to be "murder of the third degree" the Legislature intended to require a *mens rea* of malice. According to the Commonwealth, this is so because murder of the third degree has historically been defined by our Court to require proof of malice, citing to *Commonwealth v. McGuire*, 487 Pa. 208, 409 A.2d 313 (1979). Thus, the statute is not unconstitutionally vague. Like the Commonwealth, the Attorney General, who has filed a brief as amicus curiae in this appeal, also contends that Section 2506 does not fail for vagueness, but offers that 18 Pa.C.S. § 302 provides a culpability element when the General Assembly does not prescribe an applicable *mens rea*. Interpreting this provision, the Attorney General maintains that the required *mens rea* for conviction under Section 2506 is "intentional, knowing, or reckless conduct." 18 Pa.C.S. § 302(c).

In considering the parties' respective arguments, we must keep in mind the rules of statutory construction. Specifically, the polestar of statutory construction is the intent of the General Assembly. 1 Pa.C.S. § 1921(a). In ascertaining the intent of the Assembly, we are to look at the words used by the Legislature, as that is the best evidence of its intent. If the words are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). Only when the words used by the Legislature are not explicit, do we turn to other factors to ascertain its intent. 1 Pa.C.S. § 1921(c). Finally, penal provisions must be strictly construed in favor of the defendant and against the Commonwealth. 1 Pa.C.S. § 1928(b)(1).

Employing these principles, we agree with the Attorney General that while Section 2506 does not explicitly provide for

an applicable *mens rea,* the General Assembly has provided a default culpability provision in Section 302(c) of the Crimes Code that is to be applied to determine the appropriate element of culpability. Therefore, it is through this provision that we must consider the proper culpability element for Section 2506. 18 Pa.C.S. § 302(c).

The statutory default provision offers that unless prescribed by law, culpability is established if a person acts, *inter alia,* at least recklessly:

(c) Culpability required unless otherwise provided.-When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto.

18 Pa.C.S. § 302(c).

■■■ Upon review of the statute, it becomes clear that the General Assembly supplied triggering language in the Crimes Code's default culpability provision, i.e., that the default culpability of "intentionally, knowingly or recklessly" is applicable *only* where culpability "is not prescribed by law." 18 Pa.C.S. § 302(c). In this case, we believe that culpability *is* prescribed by law.

■■■ Specifically, delivery of a drug resulting in death is expressly defined by the Legislature as murder of the third degree. The law is clear and well-settled regarding the *mens rea* for third degree murder. As noted by the Commonwealth, we have consistently prescribed the culpability required for third degree murder to be malice. *See, e.g., McGuire,* 409 A.2d at 315–16 (holding that under the new Crimes Code, the offense of third degree murder incorporates common law malice as an element). Indeed, malice aforethought is the essential distinguishing factor between murder and manslaughter in Pennsylvania. JOHN BURKOFF, CRIMINAL OFFENSES AND DEFENSES IN PENNSYLVANIA 267(4th ed. 2001). Likewise, other language in the Crimes Code also makes evident that malice is the appropriate mental state required to prove murder of the third degree. Specifically, in Chapter 26

of the Crimes Code, the General Assembly clarifies that a degree of "Murder," whether under Chapter 26 or Chapter 25, includes malice. *See* 18 Pa.C.S. § 2602 Definitions (" 'Murder.' As used in this chapter, the term includes the same element of malice which is required to prove murder under Chapter 25 (relating to criminal homicide)"). Chapter 25, of course, includes Section 2506, "Drug delivery resulting in death."

Therefore, by expressly defining the crime of Drug delivery resulting in death in the clear and unambiguous words of "murder of the third degree," coupled with our case law and statutory language designating the proper mental state for third degree murder as malice, the Legislature made it plain that malice is the requisite *mens rea* for a violation of Section 2506.[7] As the *mens rea* for this crime is "prescribed by law," the lesser standard set forth in the default culpability provision of intentionally, knowingly, or recklessly, advocated by the Attorney General, is not implicated.

Based upon the above analysis, we conclude that Section 2506 is not unconstitutionally vague. First, considering the statutory language employed by the General Assembly, both in Section 2506 and the default culpability provision found at Section 302(c) of the Crimes Code, we determine that the statute provides a culpability element-malice. Moreover, we find that the Legislature, through these provisions has articulated the applicable *mens rea* with sufficient definiteness. *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855. Furthermore, by providing a *mens rea* of malice, the Legislature has supplied minimal guidelines regarding the elements necessary for a conviction pursuant to Section 2506 that are sufficiently definite. Thus, we also reason that the statute does not in any way encourage arbitrary and discriminatory enforcement. *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855. Accordingly, we hold that Section 2506 is not unconstitutionally vague and that the applicable mental state for a conviction under the statute is malice.

7. Indeed, the Superior Court has recently come to the same conclusion. *Commonwealth v. Nahavandian*, 849 A.2d 1221 (Pa.Super.Ct.2004).

Resolution of this issue, however, does not end our inquiry. The trial court also found that even if it were to conclude that Section 2506 is not unconstitutionally vague and, in fact, calls for a finding of malice, Ludwig remained entitled to relief because the Commonwealth failed to present sufficient evidence of malice aforethought to establish a *prima facie* case against him.

 To detain an individual who has been charged with a crime for trial on that offense, the Commonwealth must prove at a preliminary hearing a *prima facie* case of guilt against the accused. *See* Pa.R.Crim.P. 542(D), 543(A). To meet this burden, "the Commonwealth is required to present evidence, with regard to each of the material elements of the crime," to establish that the crime has been committed. *Commonwealth v. McBride*, 528 Pa. 153, 595 A.2d 589, 591 (1991). As determined above, malice aforethought is one such element necessary for a conviction under Section 2506.

 In determining whether malice has been established, our Court has utilized the traditional definition of that mental state set forth in *Commonwealth v. Drum*, 58 Pa. 9 (1868). That seminal definition makes clear that malice aforethought requires a unique state or frame of mind characterized by wickedness, hardness, cruelty, recklessness, and disregard of social duty:

Malice is a legal term, implying much more [than ill-will, spite, or a grudge]. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Murder, therefore, at common law embraces cases where no intent to kill existed, but where the state or frame of mind termed malice, in its legal sense, prevailed.

*Id.* at 15.

Malice has been characterized as exhibiting an "*extreme* indifference to human life," *Commonwealth v. Gardner*, 490 Pa. 421, 416 A.2d 1007, 1008 (1980) (emphasis supplied), and

"may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator 'consciously disregarded *an unjustified and extremely high risk* that his actions might cause death or serious bodily harm.'" *Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230, 232 (1981) (*quoting Commonwealth v. Hare*, 486 Pa. 123, 404 A.2d 388, 391 (1979)) (emphasis supplied).

Indeed, our Court has stated that an inference of malice is not supported even by evidence which demonstrates that a defendant acted out of anger and rage; in such a case, voluntary manslaughter, not murder, is established. *McGuire*, 409 A.2d at 317. Thus, the mental state of malice aforethought is significantly more than mere carelessness or neglect, or the disregard of a chance or possibility of death, and it is this special frame of mind that is required to obtain a conviction under Section 2506.

Turning to whether the Commonwealth met its *prima facie* case of malice in light of the above-stated definition and the facts before us, we emphasize that to satisfy the burden of setting forth a *prima facie* case, the Commonwealth is not required to prove its case beyond a reasonable doubt; it must, however, set forth evidence of the existence of each element of the crime. The absence of evidence as to the existence of a material element, however, is fatal. *Commonwealth v. Wojdak*, 502 Pa. 359, 466 A.2d 991, 996–97 (1983).

Although not set forth separately, in sum, the Commonwealth relies on five factors that it considers to be relevant regarding the malice inquiry, and that it believes leads to the conclusion that it established a *prima facie* case of malice: (1) supplying another with an illegal and dangerous substance of unknown quality; (2) lack of knowledge of the recipient's reaction or tolerance to the drug; (3) the age of the recipients; (4) providing a drug in an amount twice its "normal" dosage; and (5) motivation by profit. We will address each of these contentions *seriatim.*

First, we find that supplying an illegal and *potentially* dangerous substance of unknown quality to another does not

in and of itself support a finding of malice. Most drugs, even prescription drugs that are used illegally, may *potentially* harm. Thus, as an indication of wickedness, ill-will, cruelty, and extreme indifference to human life, the legality and mere *potential* dangerousness of a drug, without more, falls short. More importantly, this factor is objectionable in this context for another reason-while considered as a factor to determine malice, the Commonwealth uses one of the other statutory elements (delivery of an illegal drug) to establish malice. Using an existing element of the crime to demonstrate a separate element, malice, vitiates malice as an independent element to be proven and renders Section 2506 a strict liability crime.

Finally, even if this factor is relevant with respect to malice, it fails under the facts of this case. There was no evidence that Ecstasy, as objectionable a drug as it is, is an inherently dangerous drug of such toxicity that there was a substantial and "extremely high risk" that one who ingests Ecstasy will die. *Young*, 431 A.2d at 232.[8] While the Commonwealth points to evidence of the possible dangers of consuming Ecstasy, and the lack of standards in manufacturing the drug, the trial court specifically noted that the record was "devoid of evidence" that there was a high probability of death that would result from the ingestion of Ecstasy. Likewise, there was no evidence that in this case the quality of the Ecstasy in question was exceptional. Thus, we find that simply because Ludwig delivered an illegal drug that was potentially harmful to another did not rise to the level of malice.

The Commonwealth's second factor, regarding the lack of knowledge of a drug recipient's medical history and tolerance for a drug, fails to support a finding of malice as we

8. In *Commonwealth v. Bowden*, 456 Pa. 278, 309 A.2d 714 (1973), we determined that the Commonwealth had failed to establish malice where the drug at issue was heroin. "Initially, although we recognize heroin is truly a dangerous drug, we also recognize that the injection of heroin into the body *does not generally cause death.*" *Bowden*, 309 A.2d at 718 (emphasis supplied); *see also Commonwealth v. Parker*, 458 Pa. 381, 327 A.2d 128, 130 (1974).

believe, at least in the circumstances before us, it is unreasonable to conclude that not knowing a recipient's tolerance or possible reaction to a drug establishes the requisite wickedness, cruelty, recklessness, and disregard of social duty required for malice. Perhaps more importantly, this factor improperly turns the malice inquiry away from its traditional focus on the state of mind of the defendant based on the facts known to him, and instead alters the inquiry to center on the *unknown* status of the victim.

The third and fourth factors pointed to by the Commonwealth as establishing malice, providing a substance to another who is under the age of eighteen years of age and providing a double dosage of the drug, also does not establish the hardness of heart or even recklessness required for malice. First, it is important to note that Ludwig was a teenager, as were all of the other girls who ingested the drug. Moreover, the parties' actions demonstrate that all involved had a common understanding of the nature of the transaction and that the girls in fact sought out the transaction. Furthermore, in its discussion of these factors, and in particular, the furnishing of a double dose of the drug, the Commonwealth ignores that all parties involved *were aware* that the amount given to the victim was double the "normal" dosage. The uncontradicted evidence establishes that the recipients were *cautioned* by their friend to take only one half of a pill. In fact, the pills initially were split in half. Yet with knowledge of the dosage and initially taking a half pill, the girls eventually took the whole double dose. We conclude that simply because the girls chose to take a double dose of Ecstasy, a dosage against which they were expressly warned, malice was not established as to Ludwig. If there was any evidence that Ludwig had concealed the fact that it was a double dose, or evidence that Ludwig surreptitiously increased the double dose to a triple dose while offering it to the girls in the packaging of a double dose, it at least might be arguable that it is indicative of a wickedness, hardness of heart, cruelty, and recklessness; however, these are not the facts of the case.

 Finally, because one *sells* illegal drugs to another, rather than shares them with others free of charge, does not in and of itself establish malice. While the Commonwealth makes much of Ludwig's profit motive, at least in these circumstances, and without something more, we cannot agree that the mere sale of drugs is evidence of the wickedness, hardness of heart, cruelty, and recklessness required for malice aforethought.

Based upon the above analysis, we hold that the Commonwealth did not satisfy its burden of setting forth a *prima facie* case of malice under Section 2506. This Court recognizes the dangers inherent in the commerce of illegal substances as aptly illustrated by the sad facts of this matter, however, the day-to-day distribution of illegal drugs, as occurred here, without something more, does not constitute a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty such as to demonstrate an extreme indifference to human life, and thus, does not rise to the unique mental state of malice aforethought required by the General Assembly for a conviction pursuant to Section 2506. Therefore, we affirm the order of the trial court, granting Ludwig's Petition for Writ of Habeas Corpus with respect to the charge of drug delivery resulting in death.[9]

Justice NEWMAN files a concurring opinion.

Justice NIGRO files a dissenting opinion in which Justices SAYLOR and EAKIN join.

Justice NEWMAN, concurring.

I agree with the Majority that Section 2506 of the Crimes Code, 18 Pa.C.S. § 2506, is not unconstitutionally vague and

---

9. The trial court also found that the application of Section 2506 to the facts of the case violates Due Process in an attempt to hold Ludwig liable for the death of a person other than the person to whom the controlled substance was delivered. As we have decided that the Commonwealth failed to establish a *prima facie* case of malice, we need not reach this constitutional issue. *Shuman v. Bernie's Drug Concessions*, 409 Pa. 539, 187 A.2d 660, 664 (1963)(constitutional question should not be passed upon unless absolutely necessary to resolve the controversy).

that the applicable mental state for conviction under the statute is malice. I further agree that the Commonwealth has failed to establish a *prima facie* case of malice pursuant to Section 2506. However, I write separately because I do believe that the sale of drugs is an important factor in establishing the requisite malice for a third-degree murder conviction. The Majority Opinion states:

> Finally, because one *sells* drugs to another, rather than shares them with others free of charge, does not in and of itself establish malice. While the Commonwealth makes much of Ludwig's profit motive, at least in these circumstances, and without something more, we cannot agree that the mere sale of drugs is evidence of the wickedness, hardness of heart, cruelty, and recklessness required for malice aforethought.

*Commonwealth v. Ludwig*, 583 Pa. 6, 25, 874 A.2d 623, 634 (2005) (emphasis in original). I agree that an interest in making money by selling illegal drugs, without more, is not sufficient to establish that the seller "consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm." *Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230, 232 (1981) (defining malice). However, unlike the Majority, I believe that when determining the existence of malice, pecuniary gain is an element that merits significant weight. In the case *sub judice,* even when we give such weight to Ludwig's profit motive, the Commonwealth still has not established malice, especially in light of the fact that Ludwig informed the girls that they should take only half of the Ecstasy tablet at any one time.

Except for my position regarding the sale of drugs as a factor in determining malice, I join the Majority Opinion in all other respects.

Justice NIGRO, dissenting.

I agree with the majority that 18 Pa.C.S. § 2506 is not unconstitutionally vague because it fails to specify whether an offender has to possess a certain *mens rea* to commit the offense of drug delivery resulting in death. However, con-

trary to the majority, I would find that the default culpability provision in section 302(c) of the Crimes Code, 18 Pa.C.S. § 302(c), supplies the requisite *mens rea* for section 2506. Moreover, as section 302(c) only requires a *mens rea* of recklessness, I would also find that the Commonwealth adequately established a *prima facie* case of guilt against Appellee Gregory Ludwig for the offense of drug delivery resulting in death.

As the majority concedes, section 2506 does not contain an express element of culpability. *See* Op., 583 Pa. at 16–19, 874 A.2d 623, 629–30. I therefore agree with the Attorney General that we must turn to the default culpability provision, which states as follows:

(c) **Culpability required unless otherwise provided.**— When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto.

18 Pa.C.S. § 302(c). Through this provision, the General Assembly has ensured that where, as here, an offense fails to either specify a *mens rea* or indicate that it is a strict liability offense,[1] it will not suffer from vagueness problems because

1. "Absolute criminal liability statutes are an exception to the centuries old philosophy of criminal law that imposed criminal responsibility only for an 'act coupled with moral culpability.'" *Commonwealth v. Parmar*, 551 Pa. 318, 710 A.2d 1083, 1089 (1998) (citations omitted). Thus, the General Assembly enacts strict liability offenses only in limited circumstances, such as for public welfare offenses, which "do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals." *Morissette v. U.S.*, 342 U.S. 246, 255, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *see also Appeal of DaPra*, 425 Pa. 94, 227 A.2d 491, 494 (1967). "[T]hese offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty." *Morissette*, 342 U.S. at 255, 72 S.Ct. 240. Furthermore, "violations of such [offenses] result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize." *Id.* at 255–56, 72 S.Ct. 240. Another characteristic of these offenses is that they tend to impose relatively small penalties and conviction "does not grave[ly] damage . . . an offender's reputation." *Id.*; *see also* 18 Pa.C.S. § 302(a)(1) (excepting summary offenses, which are offenses for which a convicted person

section 302(c) supplies the necessary *mens rea.*[2] *See id.;* *Commonwealth v. Mayfield,* 574 Pa. 460, 832 A.2d 418, 427 (2003) (holding that trial court erroneously found that statute was vague for failing to include a specific *mens rea* element because section 302(c) supplied the necessary *mens rea* element); *Commonwealth v. Moss,* 852 A.2d 374, 380–81 (Pa.Super.2004) (finding that section 302(c) provided the scienter requirement for statute which did not include a scienter requirement and thus the statute was not unconstitutionally vague); *Commonwealth v. Pond,* 846 A.2d 699, 705–06 (Pa.Super.2004) (holding that section 302(c) provided the element of culpability for offense where statute was silent with regard to *mens rea* and there was no indication that the legislature intended to impose strict liability).

While the majority rejects the application of the default culpability provision and instead concludes that section 2506 prescribes a *mens rea* of malice based solely on the fact that it classifies the offense of drug delivery resulting in death as a third-degree murder crime, I cannot agree. Significantly, third-degree murder is a class of crimes that can include any number of different offenses. *See* 18 Pa.C.S. § 2505(c) (specifying that third-degree murder includes "[a]ll other kinds of murder" that are not first-degree murder or second-degree

may only be sentenced to a term of imprisonment of 90 days or less, from default culpability provision). Notably, none of these characteristics concerning strict liability offenses are present with respect to the offense of drug delivery resulting in death. Unlike typical strict liability offenses, the offense of drug delivery resulting in death concerns a crime of aggression in which another person is fatally injured as a direct result of consuming an illegal substance sold to her by the person charged with violating the offense. Moreover, the offense imposes a stringent penalty of at least five years of imprisonment and a fine of $15,000. *See* 18 Pa.C.S. § 2506(b). Accordingly, under these circumstances, I agree with the apparent conclusion of the majority that the General Assembly did not intend the offense of drug delivery resulting in death to be a strict liability offense.

**2.** Notably, the trial court also found that section 2506 was unconstitutionally vague because it does not provide sufficient guidelines regarding the element of causation. However, I also disagree with the trial court's conclusion in this regard because, just like section 302 of the Crimes Code provides the culpability element for section 2506, section 303 of the Crimes Code clarifies the element of causation for section 2506. *See* 18 Pa.C.S. § 303.

murder); 18 Pa.C.S. § 106(a)(1) (defining third-degree murder as class of crimes). Although this Court has held that the offense of third-degree murder requires a *mens rea* of malice, that holding does not necessarily mean that any other offense that the General Assembly classifies as a type of third-degree murder must also contain a *mens rea* of malice. Rather, in enacting an offense to be classified as a third-degree murder crime, the General Assembly is free to require a *mens rea* of malice or it may require some other element of culpability.[3] Accordingly, unlike the majority, I do not believe that this Court may presume that the General Assembly intended section 2506 to include a *mens rea* of malice merely because it classified the offense of drug delivery resulting in death as a type of third-degree murder crime. Rather, I would apply section 302(c)'s *mens rea* of recklessness to section 2506.

According to the Crimes Code, "[a] person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." 18 Pa.C.S. § 302(b)(3). Moreover, "[t]he risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." *Id.* Applying this definition of recklessness to the instant case, I would find that the Commonwealth presented sufficient evidence to establish a *prima facie* case of guilt against Ludwig with respect to the offense of drug delivery resulting in death.

Ludwig was undoubtedly aware that Ecstasy is an illegal drug, unregulated by the government for *any* use, and that

3. Indeed, I note that if the elements of the offense of third-degree murder were automatically bootstrapped into any separate offense classified as a type of third-degree murder, there would be no need to separately create such an offense because the conduct qualifying as third-degree murder under the separate offense would also constitute third-degree murder under the general offense of third-degree murder. Thus, the separate third-degree murder offense would simply be superfluous.

serious, sometimes fatal, reactions can result from the consumption of such a drug.[4] Nevertheless, despite the illegal and dangerous nature of the drug, Ludwig supplied Brandy, a minor, with an Ecstasy pill containing twice the normal dosage. In addition, Ludwig gave Brandy the pill without knowing the purity or adulterated nature of the drug, how Brandy would react to the drug, or Brandy's tolerance to the drug.[5] In my view, this evidence, particularly when considered in a light most favorable to the Commonwealth, is more than sufficient to show that Ludwig disregarded a substantial and unjustifiable risk that the direct result of his behavior would be that Brandy could die from an adverse reaction to the Ecstasy pill.[6] *See Commonwealth v. Huggins*, 575 Pa. 395, 836 A.2d 862, 869–71 (2003) (Commonwealth sufficiently proved a *prima facie* case of involuntary manslaughter against appellee where evidence showed that appellee acted recklessly

**4.** Dr. Frederick W. Fochtman, the director and chief toxicologist in the Forensic Laboratory Division of the Allegheny County Coroner's Office, explained during the Open Inquest that Ecstasy pills are illicitly manufactured, meaning "that they are not being manufactured under any standards of good laboratory practice or good manufacturing practice." R.R. at 72a; *see also id.* at 292a (testimony from Andrew Petyak, special agent of Drug Enforcement Administration, that Ecstasy is produced under very unsanitized conditions). Dr. Fochtman further testified that because these drugs are produced in such a manner, some pills might contain double or triple the quantity of Ecstasy that another pill might contain and some pills may also include other drugs besides Ecstasy. *See id.* at 72a, 80a. In explaining the effects of Ecstasy, Dr. Fochtman stated that "when the drug increases in concentration, then it will produce anxiety, agitation, it could provide-it could produce convulsions or seizures, it can cause a dystonia, where the person's muscles become very firm and very rigid, and it also could cause a CNS depressant effect, which would depress the respirations, and in addition to that, it can have an arrhythmic effect, or cause the heart to beat irregularly." *Id.* at 81a. According to Dr. Fochtman, there are multiple ways that death can result from these effects of the drug. *See id.* at 82a.

**5.** Any assertion by Ludwig that he was unaware that someone other than Michelle would ultimately consume the drug loses any potential viability when viewed in light of the Commonwealth's evidence that Michelle informed Ludwig that she was purchasing two pills for her friends, and that those friends were present when Ludwig sold the pills to Michelle.

**6.** Clearly, this risk was one that a reasonable person would have avoided if placed in Ludwig's situation.

by allowing himself to fall asleep when he was driving a van filled over-capacity with children unsecured by seat belts); *Commonwealth v. Comer*, 552 Pa. 527, 716 A.2d 593, 597 (1998) (evidence showed that appellee acted with degree of recklessness contemplated by involuntary manslaughter statute when he drank four or five beers, took muscle relaxer pills, and then drove at an excessive rate of speed). Thus, as I would find that section 2506 incorporates a *mens rea* of recklessness, and that the evidence was sufficient to show that Appellant committed the offense of drug delivery resulting in death with a *mens rea* of recklessness, I would reverse the trial court's order granting Ludwig's Petition for Writ of Habeas Corpus with respect to the offense of drug delivery resulting in death.

Justices SAYLOR and EAKIN join.